UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JEFF SIMMONS, ET AL.              :       DOCKET NO. 2:11-cv-0588

VS.                              :       JUDGE TRIMBLE

SABINE RIVER AUTHORITY OF         :       MAGISTRATE JUDGE KAY
LOUISIANA, ET AL.

MEMORANDUM ORDER

Pending before this court is the plaintiff's motion to remand this suit to the 30th Judicial

District Court, Parish of Vernon, State of Louisiana.  Doc. 8.  For the following reasons, the

Motion to Remand is **DENIED**.

*Facts and Procedural History*

This motion arises from a complaint filed in the 30th Judicial District Court, Parish of

Vernon, State of Louisiana, on February 20, 2002.  Doc. 1.  The original complaint alleged that

the Sabine River Authority of Louisiana, the Louisiana Department of Transportation and

Development, Linda Curtis Sparks, Entergy Corporation, Entergy Gulf States, Inc., and Entergy

Services, Inc.[1] "negligently and recklessly" caused catastrophic floodwaters in March, 2001, by

opening the floodgates of the Toledo Bend Dam.  *Id.*  This action was brought on behalf of two

proposed classes:

> 1)       All owners, lessees, and/or possessors by legal right of real property
>          located in the lower Sabine River Basin in Louisiana subjected to
>          floodwaters during March of 2001 and

---

[1] Hereinafter referred to, collectively, as "defendants."

1

2)      All such owners, lessees, and possessors by legal right of real property
        located along the Louisiana bank of the Sabine River south of the Toledo
        Bend dam . . . and generally north of southern boundary of Deweyville.[2]

*Id.*  According to the plaintiffs, the flooding caused by the defendants lasted forty days, until

defendants closed the flood gates on April 9, 2001.  Doc. 8, att. 1, p. 6.  Due to the opening of the

floodgates, "[h]undreds of thousands of acres of property were flooded in an area approximately

65 miles in length . . . ."  *Id.*  Plaintiffs asserted claims for trespass, nuisance, and the

unconstitutional taking of their property without just compensation in violation of Louisiana's

Constitution.  Doc. 1.  Plaintiffs sought recovery for damage to their real and personal properties,

general damages for loss of use, inconvenience, and mental anguish, and punitive damages.  *Id.*

Subsequent to the initial petition, this suit took the following course:

1)      On March 12, 2002, plaintiffs filed a First Amended Petition and Suit for
        Damages for Personal Injuries and Property Damage modifying the proposed
        class and questions of law and fact common to each class and slightly clarifying
        the original claims and damages sought.  *Id.* at pp. 35-46.

2)      On March 15, 2002, plaintiffs filed a Second Amended Petition and Suit for
        Damages for Personal Injuries and Property Damage, adding a request for
        attorney's fees and costs.  Doc. 1, att. 2, pp. 3-14.

3)      On April 2, 2002, plaintiffs filed a Third Amended Petition and Suit for Damages
        for Personal Injuries and Property Damage slightly clarifying the original claims
        and adding a request for pecuniary damages.  *Id.* at pp. 17-29.

4)      On May 7, 2002, defendant Louisiana Department of Transportation and
        Development ("DOTD") filed a Preemptory Exception of No Cause of Action,
        arguing that the DOTD had no control over the alleged cause of action, and
        requesting that plaintiffs' suit be dismissed against the DOTD.  *Id.* at pp. 37-41.

5)       On June 6, 2002, defendants Sabine River Authority of Louisiana ("SRA")[3] and
        Linda Curtis-Sparks filed a Preemptory Exception of No Cause of Action, arguing

---

[2] Hereinafter referred to, collectively, as "plaintiffs."

[3] The Sabine River Authority, State of Louisiana, was created as an agency of the State of Louisiana by Act 261 of
1950, LA. REV. STAT. ANN. § 38:2321 *et seq.*  *See Stallworth v. McFarland*, 350 F.Supp. 920, 926 (W.D. La. 1972)
(discussing the creation and purpose of the SRA).

that they were explicitly entitled to immunity pursuant to LA. REV. STAT. ANN. § 38:27.[4] *Id.* at pp. 60-67.

6)      On July 19, 2002, plaintiffs filed a Fourth Amended Petition and Suit for Damages for Personal Injuries and Property, amending their petition to include claims arising under the United States Constitution.  Doc. 1, att. 3, pp. 16-26 (citing U.S. CONST. amends. V, XIV).  This amended petition was served upon the parties on July 30, 2002.  Doc. 13, att. 4, p. 5.

7)      On December 3, 2002, the 30th Judicial District Court entered a ruling on DOTD, SRA, and Linda Curtis-Sparks' Preemptory Exception of No Cause of Actions. Finding that LA. REV. STAT. ANN. § 38:27 was inapplicable to the Toledo Bend Dam, the court dismissed the defendants' exceptions.  The DOTD, SRA, and Linda Curtis-Sparks therefore remained parties to the suit.  Doc. 1, att. 3, pp. 35-36.

8)      On September 8, 2005, plaintiffs dismissed defendant DOTD.  Doc. 1, att. 4, pp. 6-7.

9)      On February 10, 2011, plaintiffs filed a Fifth Supplemental and Amending Petition, adding a paragraph alleging the following:

> [A]t the time the claims herein were made, there was in existence and effect a policy of insurance issued by Northfield Insurance Company, which policy provided insurance coverage for the damages alleged in this matter. . . .  Further, . . . there was in existence and effect a policy of insurance issued by AEGIS [("Policy" or "AEGIS Policy")] . . . . Northfield Insurance Company and AEGIS . . . are made defendants herein under the direct action statute.

*Id.* at pp. 54-55.

On April 13, 2011, defendants sought removal to this court, under 28 U.S.C. §§ 1331, 1441, and pursuant to the Convention on Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"), 9 U.S.C. §§ 201-208.  Doc. 1, pp. 3-4.  Attached with the notice of removal were notifications indicating that all defendants consented to the removal.  Doc. 1, atts.

---

[4] LA. REV. STAT. ANN. § 38:27 provides:

> No action may be brought against the state of Louisiana, its agencies, or its agents and employees for the recovery of damages caused by the partial or total failure of any dam or through the operation of any dam on the basis that such defendant or defendants is liable to the claimant because of the approval of the dam, or the approval of plans for flood handling during the period of construction, or the issuance or enforcement of orders relative to maintenance or operation of the dam, or the control and regulation of the dam, or the measures taken to protect against failure of the dam during an emergency.

7-9.   On May 5, 2011, plaintiffs filed the motion for remand now before the court.[5]  Doc. 8.

### *Law and Analysis*

**I.      Federal Question Removal**

Jurisdiction under 28 U.S.C. § 1331 is properly invoked when plaintiff pleads a colorable claim "arising under" the Constitution or laws of the United States.[6]  *Arbaugh v. Y & H Corporation*, 546 U.S. 500 (2006).  "The assertion of a claim under a federal statute alone is sufficient to empower the District Court to assume jurisdiction over the case . . . ."  *Cervantez v. Bexar County Civil Service Commission*, 99 F.3d 730, 733 (5th Cir. 1996).  Defendants are free to "remove to the appropriate federal district court 'any civil action brought in a State court of which the district courts of the United States have original jurisdiction.'"  *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 163 (1997) (quoting 28 U.S.C. § 1441(a)).[7]  In other words, "[i]f a plaintiff files suit in state court and asserts a federal cause of action . . . the defendants might invoke § 1441 to remove the case to federal court."  *Halmekangas v. State Farm Fire and Cas. Co.*, 603 F.3d 290, 293 (5th Cir. 2010).

The propriety of removal depends on whether the case originally could have been filed in federal court.  *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Only state-court actions that originally could have been filed in federal court may be removed to federal court by

---

[5] On June 23, 2011, we heard arguments on this matter.  Doc. 26.  In response to the arguments raised at that hearing, the parties also submitted post-hearing memoranda.  Docs. 31-33.  The issues and arguments raised therein were taken under advisement.

[6] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

[7] Title 28 U.S.C. § 1441 states, in relevant part:

    (a) [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. . . .

    (b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties.

the defendant[;] absent diversity of citizenship, federal-question jurisdiction is required.”). When removal is based upon federal question jurisdiction, the attempt at removal “is governed by the ‘well-pleaded complaint rule,’ which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.”  *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 474 (1998) (citations omitted).

If an action is not initially removable, but later becomes removable, the second paragraph of § 1446(b) directs that, “a notice of removal may be filed within thirty days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable. . . .”  28 U.S.C. § 1446(b); *see also Chapman v. Powermatic, Inc.*, 969 F.2d 160, 161 (5th Cir. 1992) (“[I]f the case stated in the initial pleading is not removable, then notice of removal must be filed within thirty days from the receipt of an amended pleading, motion, order, or other paper from which the defendant can ascertain that the case is removable.”);  *McCabe v. Ford Motor Co.*, No. 10-98, 2010 WL 2545513, at *5 (E.D. Tex. June 21, 2010) (“While the first paragraph of § 1446(b) applies to cases that are removable based on the initial pleadings, paragraph two applies to cases that are not removable at the time of filing but become removable at a later date.”).  The burden of proof for establishing removal jurisdiction is placed on the party seeking removal.  *Willy v. Coastal Corp.*, 855 F.2d 1160, 1164 (5th Cir. 1988) (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92 (1921)).  “If the right to remove is doubtful, the case should be remanded.”  *Case v. ANPAC Louisiana Ins. Co.*, 466 F.Supp.2d 781, 784 (E.D. La. 2006); *see also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941) (removal is to be construed narrowly and in favor of remand to state court); *Perkins v. State of Miss.*, 455 F.2d 7 (5th Cir. 1972) (same).

Here defendants, as the removing party, bear the burden of demonstrating the proprietary

of removal.  *Gaitor v. Peninsular & Occidental S. S. Co.*, 287 F.2d 252, 253-54 (5th Cir. 1961).

Plaintiffs herein have amended their complaint to explicitly assert federal claims in their Fourth Amended Petition.  Doc. 1, att. 3, p. 23-24.  This amended petition was served upon the parties on July 30, 2002.  Doc. 13, att. 4, p. 5.  At that point, the suit became removable under the second paragraph of § 1446(b).[8]  Pursuant to the clear direction of § 1446(b), the thirty-day removal clock began to run at that same point – on July 30, 2002.  *Chapman*, 969 F.2d at 164; *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994).  Because defendants did not attempt to remove until April 13, 2011 – almost an entire nine years after the suit first became removable – the defendants are now time barred from federal question removal.

## II.      The Convention on Recognition and Enforcement of Foreign Arbitral Awards

Section 205 of the Convention, "one of the broadest removal provisions . . . in the statute books," governs removals to federal court under that statute.  *Acosta v. Master Maintenance and Construction Inc.*, 452 F.3d 373, 377 (5th Cir. 2006).  That Section articulates that

> [w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or defendants may, *at any time before the trial* thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

9 U.S.C. § 205 (emphasis added).

As a preliminary matter, district courts have consistently found that the plain language of § 205 commands that "defendants who removed under the Convention are not limited by the

---

[8] The second paragraph provides:

> if the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant . . . of a copy of an amended pleading . . . from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

28 U.S.C. § 1446(b).

usual thirty day window in which to petition for removal."[9] *Lejano v. K.S. Bandak*, No. 00-2990, 2000 WL 33416866, at *4 (E.D. La. 2000); *see also Viator v. Dauterive Contractors, Inc.*, 638 F.Supp.2d 641, 649 (E.D. La. 2009) ("Section 205 is unclouded and 'leaves no room for interpretation.'") (quoting *Lejano*, 2000 WL 33416866, at *4); *Acme Brick v. Agrupacion Exportadora de Maquinaria*, 855 F.Supp. 163, 166 (N.D. Tex. 1994) (finding § 1446(b) inapplicable to § 205 cases); *Employers Ins. of Wasau v. Certain Underwriters at Lloyd's, London*, 787 F.Supp. 165, 169 (D. Wis. 1992) (noting that "defendants can remove an action at any time before trial" because "Congress thought it important to make a federal forum freely available for Convention Act cases"); *Dale Metals Corp. v. Kiwa Chem. Indus. Co., Ltd.*, 442 F.Supp. 78, 81 n.1 (S.D.N.Y. 1977) ("Given [the] explicit time rule contained in § 205, the notion that the time provision of 28 U.S.C. § 1446(b) applies is totally without merit.").[10] Defendants' removal, therefore, is not time barred by § 1446(b).

Going to the merits of the parties' arguments, defendants argue that "[p]laintiffs' direct action claims against AEGIS invoke the AEGIS Policy and, therefore, are claims 'arising out of or relating to [the AEGIS] POLICY.'" Doc. 1, p. 6.  Thus, according to defendants, "[b]ecause the AEGIS Policy contains an arbitration clause, the subject matter of Plaintiffs' lawsuit relates to an arbitration agreement that falls under the Convention, and jurisdiction is proper in federal

---

[9] The Fifth Circuit Court of Appeal has also suggested that, if presented with the issue, it would apply the plain words of § 205 in a similar manner:

> Under section 1441(d) [of the Foreign Sovereign Immunity Act], a defendant may remove "at any time for cause shown" and under section 205 [of the Convention], a defendant may remove "at any time before the trial."  Other cases may be removed only within 30 days after the defendant receives a pleading.  *See* 28 U.S.C. § 1446(b).

*McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1212 (5th Cir. 1991).  Further, to the extent that defendants argue that the "rule of unanimity," *see Brown v. Demco, Inc.*, 792 F.2d 478, 482 (5th Cir. 1986), applies to the removal of a suit under § 205, we find that, for the reasons articulated in *Viator*, it does not.  638 F.Supp.2d 641.

[10] Courts in this Circuit have also concluded that "the general rule of unanimity (that all defendants join in removal), with no time requirement," does not apply to removals under the Convention.  *Viator*, 638 F.Supp.2d at 650-50; *see also Acosta*, 52 F.Supp.2d at 708 (noting that the purpose of the Convention "is best served by construing Section 205 in a fashion that allows a foreign insurer to remove a case arising under the Convention Act without the consent of any other party defendant").

court."  *Id.*  Moreover, defendants claim, where "plaintiffs seek to stand in the shoes of" of one of the AEGIS Policy holders "to enforce the perms of the AEGIS Policy pursuant to the direct action statute, they are 'subject to all the lawful conditions of the [AEGIS] policy,' including the arbitration clause."  Doc. 15, p. 13 (quoting *Todd v. Steamship*, No. 08-1195, 2011 WL 1226464, at *6 (E.D. La. Mar. 28, 2011)); *see also id.* at p. 14 ("Simply stated, plaintiffs cannot simultaneously invoke the AEGIS Policy as a basis for naming AEGIS as a direct action defendant and then refuse to abide by the arbitration clause in that Policy to avoid jurisdiction.").

According to plaintiffs, though, the AEGIS Policy only governs dispute resolution for "'[a]ny controversy or dispute arising out of or relating to [the] POLICY,'" which does not cover disputes between the plaintiffs and the defendants herein because the AEGIS Policy "refer[s] only to disputes between the INSURED and the COMPANY."  Doc. 8, att. 1, p. 8.  Thus, according to plaintiffs, "[t]he Notice of Removal does not allege any controversy or dispute between any of the named insureds and the company arising out of or relating to the policy."  *Id.* Although "[t]he Answer filed on behalf of AEGIS alleges the existence of the policy as an affirmative defense, [it] does not allege any coverage dispute as an affirmative defense."  *Id.*

In analyzing the merits of the parties' arguments, "the first step in determining whether a valid agreement to arbitrate exists" is to evaluate the "'terms of the agreement'" in order to determine "'[w]ho is actually bound by an arbitration agreement.'"  *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382 (5th Cir. 2008) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003)).  "In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause."  *Bridas*, 345 F.3d at 353.  Courts in this Circuit have found an exception to this rule, however, where plaintiffs are seeking to enforce the terms of an insurance policy by virtue of the Louisiana

8

Direct Action Statute, LA. REV. STAT. ANN. §§ 22:1269 & 655 (2009).  *See e.g. Todd*, 2011 WL 1226464, at \*6.  Under this statute, even in certain situations where the parties do not explicitly agree to arbitrate their disputes, they may be bound by arbitration agreement where an injured party seeks relief from an insured's insurer.  *Id.* at 6; *see also Delancey v. Chicago Ins. Co.*, No. 04-2355, 2004 WL 2694910, at \*2 n.10 (E.D. La. Nov. 22, 2004) ("The Louisiana direct action statute generally allows an injured party to proceed directly against an insurance company which has issued a policy or contract of insurance for the liability of the insured tortfeasor."); *TCC Contractors, Inc. v. Hospital Service Dist. No. 3 of Parish of Lafourche*, 52 So.3d 1103, 1114 (La. App. Ct. 2010) (noting that Louisiana's "direct action statute" accords "legal rights to the third-party claimant[s] to proceed directly against [an] insurer").  Thus, in *Adams v. Georgia Gulf Corp.*, 237 F.3d 538 (5th Cir. 2001), for instance, a case with a notably similar procedural posture as here,

> plaintiffs filed suit in Louisiana state court.  AEGIS was then named as a defendant under the Louisiana Direct Action Statute. . . . AEGIS removed the entire action to federal district court pursuant to the Convention . . . . The plaintiffs moved to remand the case back to state court.  The district court denied the motion to remand because AEGIS articulated an arbitrable dispute and the litigation related to the dispute within the meaning of the Convention . . . .

*Id.* at 539.

Here, because plaintiffs are explicitly evoking Louisiana's "direct action statute" [*see* doc. 1, att. 4, p. 54] we find that, although the arbitration provision found within the AEGIS Policy clearly does not contemplate the plaintiffs as named insureds [*see* doc. 1, att. 6], the plaintiffs are effectively "stepping into the shoes" of the named insureds for the purpose of our removal analysis.  *See Adams*, 237 F.3d 538; *Delancey*, 2004 WL 2694910, at \*2 n.10 ("Pursuant to Louisiana's direct action statute, the insurer stands in the same shoes as the insured during litigation.") (citing *Degelos v. Fidelity & Cas. Co. of New York*, 313 F.2d 809, 815 (5th

Cir. 1963)); *Ieyoub v. American Tobacco Co.*, No. 97-1174 (W.D. La., Sept 11, 1997), ECF No. 142.

Next, to determine whether removal is proper under § 205, the removing defendant must show that (1) the arbitration clause at issue "falls under the Convention" pursuant to § 202; and (2) the state court litigation "relates to" the arbitration clause for the purposes of § 205. *Acosta*, 452 F.3d at 376. We address these issues in turn.

### a. *Does the Arbitration Clause at Issue "Fall Under the Convention"?*

An agreement "falls under" the Convention pursuant to § 202 if these four prerequisites are met:

1)    there is a written agreement to arbitrate the matter;
2)    the agreement provides for arbitration in a Convention signatory nation;
3)    the agreement arises out of a commercial legal relationship; and
4)    a party to the agreement is not an American citizen.

*Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327, 339 (5th Cir. 2004) (citing *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1144-45 (5th Cir. 1985) (citation omitted)); 9 U.S.C. § 202. "Once 'these requirements are met, the Convention requires the district court[ ] to order arbitration . . . unless it finds that the said agreement is null and void, inoperable or incapable of being performed.'" *Id.* (quoting *Sedco*, 767 F.2d at 1146). "According to the Fifth Circuit, the Congress, in creating and providing for original federal jurisdiction over Convention cases, also intended to provide the broadest removal statute in the federal code." *Adams v. Oceaneering Intern., Inc.*, No. 10-1253, 2010 WL 5437192, at *2 (W.D. La. Dec. 21, 2010). Courts have made clear, however, that this policy of broad interpretation "does not apply to the initial question of whether there is a valid agreement to arbitrate." *Barna Conshipping, S.L. v. 8,000 Metric Tons*, No. 09-272, 09-163, 2010 WL 1443542, at *3 (S.D. Tex. Mar. 30, 2010) (citing *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir.

10

2004)).

An application of the *Freudensprung* factors reveals that the Policy's arbitration clause clearly "falls under the Convention."  379 F.3d at 339.  First, the Policy clearly includes a written agreement to arbitrate.  The arbitration provision in the Policy provides, in pertinent part:

> Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, shall be resolved in accordance with the procedures specified in [the Dispute Resolution and Service of Suit section of the Policy], which shall be the sole and exclusive procedures for the resolution of any such controversy or dispute. . . .  Any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof . . . shall be settled by binding arbitration in accordance with the CPR Institute Rules for Non-Administered Arbitration of Business Disputes . . . by three (3) independent and impartial arbitrators.

Doc. 1, att. 6, p. 33.  Second, the Policy provides for arbitration in the United States, a Convention signatory nation.  *Id.* at p. 33-34.  Third, there is no doubt that the relationship between an insured and an insurer clearly constitutes a "commercial legal relationship."  *Phillips Petroleum Co. v. All American Marine Ship*, No. 98-1530, 1998 WL 398178, at *3 (E.D. La. July 15, 1998).  Finally, "AEGIS is a Bermuda corporation with its principal place of business in Bermuda."  *Adams*, 237 F.3d at 539.

Here, because all four *Freudensprung* prerequisites have been met, we find that the AEGIS Policy "falls under" the Convention pursuant to § 202.

> b.   <u>Does the State Court Litigation "Relate To" the Arbitration Clause?</u>

"[W]henever an arbitration agreement falling under the Convention could conceivably affect the outcome of the plaintiff's case, the agreement 'relates to' to the plaintiff's suit."  *Beiser v. Weyler*, 284 F.3d 665, 671 (5th Cir. 2002); *see also Infuturia Global Ltd. v. Sequus Pharmaceuticals, Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011) ("The phrase 'relates to' is plainly broad, and has been interpreted to convey sweeping removal jurisdiction . . . ."); *Huntsman*

*Corp. v. International Risk Ins. Co.*, No. 08-2008, 2008 WL 4453170, at *17  (S.D. Tex. Sept. 26, 2008) (noting the "broad sweep of actions removable [pursuant to] section 205").  On the other hand, though, some courts have held that "if a particular dispute falls outside an arbitration clause's terms," the agreement does not "relate to" the suit and the Convention is not triggered. *Century Indem. Co. v. Certain Underwriters at Lloyd's of London*, 584 F.3d 513, 536 (3rd Cir. 2009) (citing *Rice Co. v. Precious Flowers Ltd.*, 523 F.3d 528, 536 (5th Cir. 2008)); *see also Martinez v. Colombian Emeralds, Inc.*, Nos. 07-0006, 07-0011, 2009 WL 578547, at * 28 (V.I. Mar. 4, 2009)  ("Surely, the scope of 'relates to' is not endless.").

We find the Fifth Circuit's discussion in *Acosta*, 452 F.3d 373, to be instructive in its discussion of the "relate to" requirement.  In *Acosta*, over 2,000 plaintiffs brought state-law tort actions in a Louisiana State court, alleging injuries stemming from the release of a mustard-gas agent at the Georgia Gulf Corporation ("GSC") facility in Plaquemine, Louisiana.  *Id.* at 375. Pursuant to Louisiana's direct action statute, Plaintiffs added as defendants two foreign insurers whose insurance policies included arbitration clauses governing disputes over coverage.  *Id.* Shortly thereafter, the foreign insurers notified GGC that they were disputing insurance coverage as a result of the plaintiffs' allegations, and arbitration commenced.  *Id.*  Defendants then removed the suit to federal court, arguing that plaintiffs' allegations "created a coverage dispute between them and GGC, thus invoking the arbitration clauses of their insurance policies and bringing the action within the purview of the Convention Act and its provisions for removal." *Id.*  The court found that

> "Relate" means "to have connection, relation, or reference[.]"  It is unarguable that the subject matter of the litigation has some connection, has some relation, has some reference to the arbitration clauses here.  [Plaintiffs]' assertion of claims against the insurers is, in part, an assertion of policy coverage of the insured's alleged torts.  Common sense dictates the conclusion that policy provisions relating to coverage of the insured's torts are, almost by definition, related to

> claims that are based on the disputed assertion of coverage of the insured's torts. The arbitration clauses here declare the forum for the resolution of coverage disputes; they are therefore related to [plaintiffs]' disputed assertion of coverage and, hence, to the subject matter of [plaintiffs]' claims against the defendant insurers that depend on the existence of coverage.  Stated as a rule, a clause determining the forum for resolution of specific types of disputes relates to a lawsuit that seeks the resolution of such disputes.

*Id.* at 378-79 (internal citations omitted).  The fact that the claims were brought against the insurers under the Louisiana Direct Action Statute did not mandate a different result:

> The jurisdictional question need not be confused by the presence of the direct-action statute.  The operation of the direct-action statute as a matter of Louisiana state law does not alter the fact that the litigation is related to the arbitration clause as a matter of logic and federal removal law.  Both state and federal courts can give proper effect to the direct-action statute; but we cannot ignore Congress's decision that the federal courts are best able to establish uniformity in the enforcement of arbitral agreements.

*Acosta,* 452 F.3d at 379; *see also Louisiana Crawfish Producers Ass'n West v. Amerada Hess Corp.*, No. 10-0348, 2010 WL 2024729, at *3 (W.D. La. May 14, 2010) (same).

Here, defendants urge us to rule similarly, arguing that "[b]ecause plaintiffs' Fifth Supplemental and Amending Petition invokes the AEGIS policy for the very basis of naming AEGIS as a defendant pursuant to Louisiana's direct action statute, . . . plaintiffs' claims against AEGIS are claims 'arising out of or relating to [the AEGIS] POLICY' that fall within the mandatory arbitration provision."  Doc. 15, p. 13.  There is a question, however, as to whether *Acosta* is directly on point here as there appears to be no coverage dispute *between co-defendants* that has invoked the arbitration provision of the AEGIS Policy.

In *Adams v. Oceaneering Intern., Inc.*, 10-1253, 2010 WL 5437192 (W.D. La. Dec. 21, 2010), however, Judge Melançon shed light on this query.  In *Adams*, the plaintiff filed a petition for damages in the Sixteenth Judicial District Court for the Parish of St. Mary, State of Louisiana, seeking to recover for injuries allegedly sustained while working on the defendant's

boat. *Id.* at *1.  Subsequently, the plaintiff amended his petition to bring a claim against the defendant's insurer, a foreign company, pursuant to the Louisiana Direct Action Statute. *Id.*  The defendant insurer removed the suit to federal court, alleging the evocation of an arbitration clause pursuant to the Convention, and the plaintiff filed a motion to remand. *Id.*  In looking to the "arising out of" requirement, the court noted that "'the district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense.'" *Id.* at *3 (quoting *Beiser v. Weyler*, 284 F.3d 665, 671 (5th Cir. 2002)).  Thus, the court found that because "the definition of 'relates to' . . . keeps the jurisdictional and merits inquiries separate[,] 'absent the rare frivolous petition for removal, as long as the defendant claims in its petition that an arbitration clause provides a defense, the district court will have jurisdiction to decide the merits of that claim.'" *Id.* (quoting *Beiser*, 284 F.3d at 670).  In other words, as long as the removing party can non-frivolously argue that a plaintiff "may have been bound by the arbitration agreement," a plaintiff's state action will be deemed properly removed by the defendant. *Id.*; *see also Beiser*, 284 F.3d at 669 ("As long the defendant's assertion is not completely absurd or impossible it is at least conceivable that the arbitration clause will impact the disposition of the case.  That is all that is required to meet the low bar of 'relates to.'"); *QPro Inc. v. RTD Quality Services USA, Inc.*, 718 F.Supp.2d 817, 822 (S.D. Tex. 2010) ("Recent case law shows that the broad definition of 'relates to' adopted in *Beiser* is still the standard for defining jurisdiction under the Convention Act.").

Applying this rule to the facts of the case, the *Adams* court found that the "litigation [was] related to the arbitration clause in [the co-defendants'] insurance contract," and that, therefore, the court had removal jurisdiction. *Adams*, 2010 WL 5437192, at *3.

Here, the exact jurisdictional facts exist as in *Adams*.  Plaintiffs have made a claim that conceivably "relates to" the arbitration agreement.  Defendants assert as much in their removal notice, arguing that because the Policy contains a clause subjecting "any controversy . . . relating to" the AEGIS Policy to arbitration, the mere evocation of the AEGIS Policy to bring suit against the insurers necessarily "relates to" the AEGIS Policy.  Although defendants have not shown that plaintiffs are subject to the arbitration provision of the AEGIS Policy, the jurisprudence of this Circuit clearly establishes that this is not a requirement of the "relates to" test.  *See Beiser*, 284 F.3d at 670 ("[E]ven if [the plaintiff] is right on the merits that he cannot ultimately be forced into arbitration, his suit at least has a 'connection with' the contracts governing the transaction out of which his claims arise."); *QPro Inc.*, 718 F.Supp.2d at 824 ("The defendant need not show that it has the right to enforce the arbitration agreement."); *Francisco v. Stolt-Nielsen, S.A.*, No. 02-2231, 2002 WL 31697700, at *7 (E.D. La. Dec. 3, 2002) (noting that Louisiana's "Direct Action Statute permits plaintiff [to] sue the insurer directly," but does not bar "the insurer from raising the issue of pending arbitration").  Again, the rule is not that heart of the dispute must "relate to" the arbitration clause, but that there must be a possibility, in the entirety of the state court litigation, that an arbitration clause will impact the outcome of the suit.  *Beiser*, 284 F.3d at 669.

In light of the forgoing, we find that the arbitration clause at issue "falls under the Convention" and that the state court litigation in this matter "relates to" an arbitration clause covered by the Convention, and therefore confers jurisdiction upon this court.

## III.   Eleventh Amendment Immunity

### a.   *Plaintiffs' Argument*

Plaintiffs argue that this suit should be remanded because "[t]he State of Louisiana,

15

through the [SRA], has not consented unequivocally and unambiguously in writing to the removal of this case to federal court nor has the State of Louisiana waived its Eleventh Amendment immunity to suit in federal court."  Doc. 8, p. 1.

Plaintiffs argue that because "[SRA] is a state agency protected by the immunity conferred by the Eleventh Amendment," the suit cannot be removed to federal court.  *Id.* at att. 1, p. 9.  Plaintiffs urge us to apply the "arm-of-the-state" analysis in determining whether or not SRA is entitled to Eleventh Amendment immunity and articulate the test as a balance of the following factors:

1)  How the compact designated the bi-state entity;
2)  The number of governing members appointed by the local counties and the number appointed by the compacting states;
3)  The legislative power of the states retained over the entity;
4)  How the compact entity was funded;
5)  The primary function that the bi-state entity served; and
6)  Whether the states' treasuries would be liable for a judgment against the compact entity.

Doc. 20, att. 2, p. 2 (citing *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391 (1979)).  Plaintiffs then point to the following wording in LA. REV. STAT. ANN. § 38:2321 *et seq.*:

1)  The [SRA] is hereby declared to be an agency and instrumentality of the state of Louisisna . . . .
2)  The authority shall operate from self-generated revenues and shall not be a budget unit of the state.  **The authority may, however, receive state appropriations at any time it is deemed advisable by the legislature, and only the expenditure of such appropriated funds shall be subject to budgetary controls or authority of the division of administration.** . . .
3)  . . . **The budget shall be submitted to the Joint Legislative Committee on the Budget for review and approval.** . . .
4)  . . . **The budget shall be submitted to the Joint Legislative Committee on the Budget for review and approval.**
5)  . . . The board shall be composed of thirteen members, **who shall be appointed by the governor** . . . .
6)  Each law enforcement officer shall execute a bond in an amount set by the

16

> board of commissioners **in favor of the state of Louisiana** for the faithful
> performance of his duties. . . .
>
> 7)      . . . Authority shall be audited by the state auditor . . . in such a manner as
> to enable him to report to the legislature as to the manner and purpose of
> the expenditure of all funds of the Authority . . . .

Doc. 20, att. 2, pp. 3-4 (internal citations and quotations omitted, emphasis in original).  Next, in

applying the "arm-of-the-state" test to SRA, as the entity is described in its governing statute,

plaintiffs conclude that

> [t]he governing members of the SRA are not appointed by any local entity, but are
> appointed by the Governor of the State of Louisiana. . . . The state of Louisiana
> retains legislative power over the SRA . . . . The SRA is not financially
> independent from the state of Louisiana, and thus it fails the "state treasury"
> criteria . . . . Furthermore, the control exercised by the state of Louisiana over the
> SRA manifests an intent to confer immunity on the SRA.  An analysis of these
> statutory grants to the SRA can result in only one conclusion – that the SRA is not
> an autonomous governmental entity and therefore enjoys Eleventh Amendment
> immunity.

*Id.* at pp. 4-5.

Having established that SRA is assured Eleventh Amendment immunity, plaintiffs

recognize that immunity can be diminished in three circumstances, but argue that none of these

circumstances are present.  First, "although a state may waive its sovereign immunity by its

litigation conduct or consent" – by voluntarily invoking a federal court's subject matter

jurisdiction or consenting to removal, for example[11] – plaintiffs argue that the State's Attorney

General does not have this authority by statute, pursuant to LA. REV. STAT. ANN. § 13:5106, and

that, therefore, any "purported 'consent' or 'waiver' through its counsel of record is . . . illegal,

invalid, and requires remand of this action."  *Id.* at pp. 11-12.  Second, immunity can be waived

by state statute.  *Id.* at p. 11.  Plaintiffs argue that, here, the opposite has taken place, as

---

[11] Plaintiffs cite for this rule *Lapides v. Bd. of Regents*, 535 U.S. 613 (2002), and *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236 (5th Cir. 2005).  Plaintiffs also argue that the facts of this case are distinguishable from *Lapides* and *Benzing* because SRA's consent to removal "was filed conditionally '[w]ithout waiving any rights and solely for the purpose of the Notice of Removal herein . . . .'"  Doc. 8, att. 1, p. 13 (quoting doc. 1, att. 8).

Louisiana law explicitly recognizes and asserts state sovereign immunity in federal suits.  *Id.* at 12 (citing LA. REV. STAT. ANN. § 13:5106(A) ("No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court.").  Finally, states are not allowed Eleventh Amendment protection when "Congress abrogates state immunity."  *Id*. at 11.  Plaintiffs contend that although the Convention implicitly waives state sovereign immunity where it applies, because the "goal of the Convention directly conflicts with the Eleventh Amendment to he United States Constitution," the applicability of the Convention should be narrowly construed to permit a waiver only in those instances where a waiver or exception to the Eleventh Amendment has been substantiated elsewhere in law.  *Id.* at p. 14; *see also id.* ("Suits against the State of Louisiana by '. . . Citizens or Subjects of any Foreign State' are expressly prohibited by the Eleventh Amendment.") (quoting U.S. CONST. amend. XI).

> b. *Defendants' Argument*

Defendants, on the other hand, argue that SRA is at the outset "***presumed*** not to be subject to Eleventh Amendment immunity" because the entity was created pursuant to an interstate compact subject to the Interstate Commerce Clause of the U.S. Constitution.  Doc. 15, p. 6 (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 43 (1994)) (emphasis in original).  But even if the court were to apply an "arm-of-the-state" analysis, defendants assert, the following factors "point overwhelmingly to a conclusion that the Eleventh Amendment Immunity does *not* apply to SRA Louisiana" [*id.* at p. 9]:

1) SRA Louisiana operates from self-generated revenues, and is not a budget unit of the State.  La. R.S. 38:2324(B).  SRA Louisiana is only in charge of a six-parish district.  La. R.S. 38:2321.
2) SRA Louisiana is run by a board of commissioners appointed by the governor, all of whom must be residents of SRA parishes.  La. R.S. 38:2322(A)(1).
3) SRA Louisiana is a corporation with the power to sue and be sued in its own name.  La. R.S. 38:2324(A), (B)(2).

4)   SRA Louisiana has the power to acquire and hold property.   La. R.S. 2325(A)(2).

5)   SRA has the power to incur debts, and *"no debt so incurred shall be payable from any source other than the revenues derived by the authority . . . ."* La. R.S. 38:2325(A)(5) (emphasis added).

*Id.* at pp. 8-9; *see also* doc. 25, att. 3, p. 2 ("SRA Louisiana does not have Eleventh Amendment immunity, because the State is not obligated to pay any debts of SRA Louisiana.").

Further, according to defendants, "Fifth Circuit law is clear that because [SRA] has not invoked sovereign immunity, plaintiffs have no basis on which to invoke sovereign immunity as a bar to federal jurisdiction."  Doc. 15, p. 16; *see also id.* ("'[T]he simple act of assuming jurisdiction over a case with a state defendant does not step on its sovereign immunity.  A federal court may ignore sovereign immunity until the state asserts it.'") (quoting *Frazier v. Pioneer American LLC*, 455 F.3d 542, 547 (5th Cir. 2006).  This is because "[a] federal court may ignore sovereign immunity until 'the state asserts it' – and, here, SRA "consented to the removal through its authorized counsel of record, and has not asserted Eleventh Amendment immunity." *Id.* at p. 11 (quoting *Frazier*, 455 F.3d at 547).

In rebutting plaintiff's argument that defendants do not have the authority to consent in the removal, defendants argue that "it is axiomatic that attorneys are vested with the authority to act on behalf of their clients with respect to ongoing litigation."  Doc. 17, p. 1.  In other words, "[w]hen an attorney makes a formal appearance for the client, this constitutes 'record evidence of the highest character' of an attorney-client relationship, and 'the presumption becomes almost irrebuttable.'"  Doc. 15, p. 10 (quoting *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 387 (S.D. Tex. 1969)).  Thus, according to defendants, "[p]laintiffs have presented absolutely no evidence that counsel for SRA Louisiana was not authorized to conduct these litigation steps. Accordingly, the consent was valid."  *Id.* at p. 11.

19

### c.  *Arm-of-the-State Analysis*

At least one court has referred to SRA as "a political subdivision of the State."  *Stanton v. U.S.*, 434 F.2d 1273, 1274 n.1 (5th Cir. 1970).  However, because we find that the *Stanton* Court's suggestion was merely *dicta* and therefore not binding on this court, we opt to conduct a full "arm-of-the-state" analysis on our own accord.

The Second Circuit has stated:

> [I]n deciding whether . . . a bistate entity created by an interstate compact between those two states [is] covered by the Eleventh Amendment [courts look to]: (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Mancuso v. New York State Thruway Authority*, 86 F.3d 289, 293 (2nd Cir. 1996) (citing *Lake Country Estates,* 440 U.S. 391 (1979)); *see also Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994); *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1086 (8th Cir. 1991).  Although none of the criteria are conclusive, two circuits have stated the most important criterion is whether the compacting states are financially responsible for judgments against the agency.  *Feeney v. Port Auth. Trans-Hudson Corp.,* 873 F.2d 628, 631 (2d Cir. 1989), *rev'd on other grounds,* 495 U.S. 299 (1990); *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659-60 (3d Cir.) (en banc), *cert. denied,* 493 U.S. 850 (1989); *see also* Walter Landry Smith, Comment, *Eleventh Amendment Immunity and State-Owned Vessels*, 57 Tul. L. Rev. 1523, 1528 (1983) (in determining whether to extend the Eleventh Amendment to a state agency "[t]he essential, but not exclusive, test is whether a monetary judgment against the agency would be satisfied out of the state treasury") (internal citations

omitted).  We will consider each of the criteria in turn.[12]

### i.  Creating Documents

The SRA's creating document, LA. REV. STAT. ANN. § 38:2321, refers to the entity as "Sabine River Authority, State of Louisiana."  The statute also states that "[t]he Sabine River Authority is hereby declared to be an agency and instrumentality of the state of Louisiana . . . ."  *Id.* at § 38:2324.  Therefore, the first factor weighs toward the finding that the SRA is an arm of the state.  *See John's Insulation, Inc. v. Facilities Development Corp.*, No. 96-0672, 1996 WL 679723, at *5 (N.D.N.Y. 1996).

### ii.  Appointment of Governing Members

The governing authority of the SRA is vested in a "board of commissioners."  LA. REV. STAT. ANN. at § 38:2322(A)(1).  This Board consists of thirteen members, each appointed by the governor of the State of Louisiana and confirmed by the State Senate.  *Id.* at 38:2322(A)(1)-(2).  Pursuant to LA. REV. STAT. ANN. § 38:2322(A)(2), "[e]ach member of the board appointed by the governor [serves] at the pleasure of the governor making the appointment."  *See also id.* at § 2330.2(B) ("[t]he members of the Sabine River Compact Administration appointed by the governor to represent the state . . . .").

The second factor weighs toward the finding that the SRA is an arm of the state as well.

---

[12] On June 29, 2011 plaintiffs submitted a post-hearing brief citing to nine Louisiana State Court suits where they contend that SRA has been recognized as an arm of the state.  Doc. 30 (citing *State Through Sabine River Authority v. Phares*, 159 So.2d 144 (La. 1964); *State Through Sabine River Authority v. Miller*, 184 SO.2d 780 (La. App. Ct. 1966); *State Through Sabine River Authority v. Salter*, 184 SO.2d 783 (La. App. Ct. 1966); *State Through Sabine River Authority v. Woodard*, 198 So.2d 401 (La. 1967); *State Through Sabine River Authority v. Pilcher*, 228 SO.2d 667 (La. App. Ct. 1969); *State Through Sabine River Authority v. Pierce*, 230 SO.2d 751 (La. App. Ct. 1970); *Sabine River Authority v. Pendleton Bridge Marina, Inc.*, 308 SO.2d 420 (La. App. Ct. 1975); *Sabine River Authority v. Flying Bridge Marina, Inc.*, 308 SO.2d 422 (La. App. Ct. 1975); *State Through Sabine River Authority v. Lucius*, 335 SO.2d 59 (La. App. Ct. 1976)).  Although these cases make clear that the State of Louisiana, through its courts, has in the past assumed responsibility for, acted on behalf of, or otherwise appeared in suits involving SRA, none of these cases address the "arm of the state" issue, state sovereign immunity, or any other questions of federalism involved here.  Although their discussions on the roles and responsibilities of SRA are informative, these cases are not on point.

Certainly, the State of Louisiana is deeply involved in the selection of those who run the SRA.

*John's Insulation, Inc.*, 1996 WL 679723, at *5.

iii.   Funding

Funding of the SRA is controlled by LA. REV. STAT. ANN. § 38:2324(B), which states, in

relevant part:

> (1) The authority shall operate from self-generated revenues and shall not be a budget unit of the state.  The authority may, however, receive state appropriations at any time it is deemed advisable by the legislature, and only the expenditure of such appropriated funds shall be subject to budgetary controls or authority of the division of administration.  The authority shall establish its own operating budget for the use of its self-generated revenues or unencumbered fund balances subject to majority approval of the board of commissioners of the authority.  Any budget adopted shall be effective for a fiscal year commensurate with that of the state.  The budget shall be submitted to the Joint Legislative Committee on the Budget for review and approval.

> (2) The authority shall not have the power to levy taxes but it may assess and collect charges, fees, and rentals for the use of its lands or water bottoms and for the construction, installation, maintenance, and operation on such lands or water bottoms, or on the surface of any lake or reservoir owned by it or in which it has an interest, any wharf, dock, boathouse, pier, marine, shop, store, gasoline dispenser, or other commercial establishment.

The Statute then goes on to state that the SRA

> will be performing an essential public function under the constitution and shall not be required to pay any tax or assessment on its properties or any part thereof, nor to pay any excise, license, or other tax or imposition on its operating revenues, and the bonds issued hereunder and their transfer and the income therefrom shall at all times be free from taxation within this state.

*Id.* at § 38:2324(D).

On its face, the statute is somewhat vague as to the most important aspect of funding,

whether the State of Louisiana is financially responsible for judgments against the agency.

Although defendants argue that "the applicable statutes provide that no debts of SRA Louisiana

are payable from any source other than its own revenues" [doc 25, att. 3, p. 2], the statute

referenced actually states that the SRA is able to "incur debts and borrow money, but no debt so incurred shall be payable from any source other than the revenues to be derived by the authority from sources other than taxation." *Id.* at § 38:2325(A)(5).  A plain reading of this statute seems to mean that if the SRA borrows, it must pay back those debts from its own coffers, rather than those appropriations paid by the state.  Another part of the statute, § 2334, grants the SRA the authority to "make reimbursement for any actual damages" caused by its acquisition of lands, but the statue is silent on where those funds derive.

A State of Louisiana Attorney General's opinion sheds some light on the matter as to the State control over the SRA's funding.  In LA. ATTY. GEN. OP. No. 98-252, J. Roger Magendie (1998), the State Attorney General concluded that SRA constitutes a "budget unit" within the State's Budget Office.  *Id.* at *7.  Pursuant to Louisiana law, as a "budget unit," the SRA "is subject to inspections and examinations by designated agents of the governor."  *Edwards v. Board of Trustees of State Employees Group Benefits Program*, 644 So.2d 776, 778 (La. App. Ct. 1994)

From what we can tell, based upon a thorough reading of the governing statutes and the parties' briefing, it appears that SRA's governing documents are silent regarding the involvement of the state treasury in paying a judgment against SRA.  However, it is certain that, at minimum, SRA is not financially independent from the State of Louisiana in either the source or control of its funding.  This weighs in favor of finding that SRA is an arm of the state.  *See John's Insulation, Inc.*, 1996 WL 679723, at *5 (finding that an entity's status is that of an arm of the state where monies appropriated to the entity were subject to state budget rules and regulations).

iv.   Traditional Function

SRA was created by a Louisiana State legislative act in 1950.  *State of La., Through Sabine River Authority v. Lindsey*, 524 F.2d 934, 935 (5th Cir. 1975).  Following feasibility studies throughout the 1950's, the SRA of Louisiana and the SRA of Texas on July 6, 1961 entered into a basic contract to construct and manage the Toledo Bend Dam and Reservoir.  *Id.* It is now clearly established that land and water management issues are "traditionally significant to the States," and thus constitute "traditionally local functions."[13]   *Briar Meadows Developments, Inc. v. South Centre Tp. Bd. of Sup'rs*, No. 10-cv-1012, 2010 WL 4024775, at *4 (M.D. Pa. 2010); *see also Sierra Club v. City of San Antonio*, 112 F.3d 789 (5th Cir. 1997); *State Street Bank & Public School Retirement System of Missouri v. State Street Bank & Trust Co.*, 640 F.3d 821, 829 (8th Cir. 2011) (listing "'water service, flood control, [or] rubbish disposal'" as the "type of local services that political subdivisions typically furnish") (quoting *Moor v. Alameda County*, 411 U.S. 693, 720 (1973)).

This weighs in favor of finding that SRA is an arm of the state.

v.   Veto Power

The SRA creating statute is silent on State veto power.  However, under LA. REV. STAT. ANN. § 2322(A)(2), each member of the board must be "appointed by the governor" and serves "at the pleasure of the governor making the appointment."

This weighs in favor of finding that SRA is an arm of the state.

vi.   Ability to Bind the State

Although the ability of SRA to bind the State of Louisiana is not made explicit in the governing statute, a number of provisions support a finding that it does.

---

[13] The State of Louisiana's Attorney General has also explicitly recognized that SRA is one of the entities that are "traditionally owned and operated by governmental agencies, political subdivisions, or quasi-governmental corporations that are funded by taxpayers."  LA. ATTY. GEN. OP. No. 09-0148, at 11, Mr. Frederick D. Heck (2010).

LA. REV. STAT. ANN. § 2324(A), for instance, states that "[t]he Sabine River Authority is hereby declared to be an agency and instrumentality of the state of Louisiana required by the public convenience and necessity for the carrying out of the functions of the state . . . ."  LA. REV. STAT. ANN. § 2324(D) states that "[s]aid authority, in carrying out the purposes of this Chapter, will be performing an essential public function under the constitution . . . ."  Likewise, LA. REV. STAT. ANN. § 2325(B) states that

> [t]itle to all property acquired by the Authority shall be taken in its corporate name and shall be held by it as an instrumentality of the State of Louisiana . . . The Authority shall have and be recognized to exercise such authority and power of control and regulation over the waters of the Sabine River and its tributaries as may be exercised by the State of Louisiana, subject to the provisions of the constitution of Louisiana.

Pursuant to LA. REV. STAT. ANN. § 2325(A)(16), however, this ability to bind the State in some instances requires "the written concurrence of the governor shall be required for any contracts and other agreements which provide for the sale, utilization, distribution, or consumption, outside of the boundaries of the state of Louisiana, of the waters over which the Authority has jurisdiction or control."

Taken together, we find that SRA has the authority to bind the state in most instances. This weighs in favor of finding that SRA is an arm of the state.

### d.  *Waiver Analysis*

Generally, the law of Eleventh Amendment sovereign immunity bars all individuals from suing a state in federal court.[14]  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 318 (5th Cir. 2001).  "A state's immunity from suit is not absolute,"

---

[14] "'Eleventh Amendment immunity' is a misnomer . . . because that immunity is really an aspect of the Supreme Court's concept of state sovereign immunity and is neither derived from nor limited by the Eleventh Amendment." *Meyers*, 410 F.3d at 240-41.

however.  *Meyers*, 410 F.3d at 241.  Here, although we find that SRA should be afforded sovereign immunity under the Eleventh Amendment, we nonetheless find that SRA has waived that sovereign immunity.

A State may "constructively" waive its sovereign immunity by making "'an unequivocal indication that the State intends to consent to federal jurisdiction.'"[15]  *Lockett v. New Orleans City*, 639 F.Supp.2d 710, 721-22 (E.D. La. 2009) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n. 1 (1985)); *see also Cozzo*, 279 F.3d at 281 ("When a state agency is the named defendant, the Eleventh Amendment bars suits for both money damages and injunctive relief *unless the state has waived its immunity*.") (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)) (emphasis added).  "In this context, the Fifth Circuit has held, under the Supreme Court's decision in *Lapides*, that a State's voluntary action in removing a case from state to federal court constitutes an unequivocal waiver of Eleventh Amendment immunity."  *Id.* at 723 (citing *Meyers*, 410 F.3d at 255)); *see also Varnado v. Hegmann*, 211 F.Supp.2d 801 (M.D. La. 2002) (state defendant waived its Eleventh Amendment immunity by voluntarily removing action from state to federal court, thereby invoking federal-court jurisdiction, regardless of the state statute making clear that no attorney for state had authority to waive state's Eleventh Amendment immunity); *Archie v. LeBlanc*, No. 08-1381, 2010 WL 3522296 (W.D. La. July 28, 2010) (same); *Levy v. Office of Legislative Auditor*, 362

---

[15]  This analysis is separate from whether the state waived its immunity from liability.  *Meyers*, 410 F.3d at 255; *Caldera v. County of El Paso, Tex.*, 520 F.Supp.2d 846, 852 (W.D. Tex. 2007) ("A State may, in some circumstances, retain immunity from liability while waiving its immunity from suit. . . . However, immunity from liability does not affect a court's jurisdiction to hear a case . . . ."); *see also* Jonathan R. Siegel, *Waivers of State Sovereign Immunity and the Ideology of the Eleventh Amendment*, 52 DUKE L.J. 1167, 1234 (2003) (explaining that "state sovereign immunity has two independent aspects: it is partly an immunity from suit in a particular forum (federal court) and partly a substantive immunity from liability," and "removal should be understood to waive only forum immunity").  Here, SRA's consent to removal "was filed conditionally '[w]ithout waiving any rights and solely for the purpose of the Notice of Removal herein . . . .'" Doc. 8, att. 1, p. 13 (quoting doc. 1, att. 8).  Thus, our jurisdictional holding should be construed as having no effect one way or the other on SRA's immunity from liability.

F.Supp.2d 729, 735 (M.D. La. 2005) (same)[16]; Erwin Chemerinsky, Federal Jurisdiction 459 (5th ed. 2007) ("[I]f the state removes a case from state to federal court, it has made the choice to invoke federal jurisdiction and thus waives its sovereign immunity.").  Because the Fifth Circuit construes this waiver by consent broadly, *see Dimitric v. Texas Workforce Comm'n*, No. 07-0247, 2008 WL 687463, at *3 (S.D. Tex. Mar. 11, 2008) ("[T]he Fifth Circuit has broadly interpreted *Lapides*"); *Bergemann v. Rhode Island*, 676 F.Supp.2d 1, 6 (D.R.I. 2009) (noting that the Fifth Circuit "employ[s] a very broad reading of *Lapides*"), waivers will be found where a state defendant merely consents to a co-defendant's removal.  *See Dimitric*, 2008 WL 687463, at *9 (noting the "inescapable conclusion that [the state co-defendant] waived its immunity from suit when it consented to remove the claims from state court").

Courts in this Circuit have also held that where a state does not waive its immunity, federal courts "may ignore immunity until the state defendant asserts it."  *Shimon v. Sewerage & Water Bd. of New Orleans*, No. 05-1392, 2007 WL 4414709, at *6 (E.D. La. Dec. 14, 2007).  In *Frazier*, for example, plaintiffs sued the Louisiana Department of Environmental Quality ("DEQ") and other defendants in state court, alleging that "DEQ neglected its statutory duties to monitor, inspect, report emissions, and warn citizens of dangerous emissions."  455 F.3d at 544.  Without DEQ's consent, a co-defendant removed the case to federal court.  *Id.*  After reviewing relevant Fifth Circuit case law, the *Frazier* court held that it had jurisdiction over the suit, noting that "the simple act of assuming jurisdiction over a case with a state defendant does not step on its sovereign immunity" because a "federal court may ignore sovereign immunity until the state

---

[16] Plaintiffs attempt to distinguish these cases by arguing that "*Archie*, *Levy*, and *Varnado* are inapplicable to this case inasmuch as the Louisiana Attorney General, on behalf of the State of Louisiana, did not consent to removal of this matter." Doc. 8, att. 1, p. 12.  Rather, here, consent was obtained from counsel for defendant SRA.  Plaintiffs fail, however, to show how or why this distinction should have any bearing on the matter.  Although we would be honored to have Mr. Caldwell in our court, there is no indication in the case law or otherwise indicating that the bar was set at *the* State Attorney General's waiver, rather than counsel acting on behalf of the state entity.

asserts it." *Id.* at 547; *see also Lockett*, 639 F.Supp.2d at 720 ("Eleventh Amendment immunity is not a jurisdictional bar in and of itself, [but instead] grant[s] a state the power to assert the immunity defense on its own discretion.") (citing *Wis. Dept. Of Corrections v. Schacht*, 524 U.S. 381 (1998)); *In re Search of 2847 East Higgins Road, Elk Grove Village, Ill.*, 390 F.3d 964 (7th Cir. 2004) ("[I]f the government fails to raise a defense of sovereign immunity . . . a court can ignore it."); *Black Cowboys, LLC v. State of Indiana Dept. of Natural Resources*, No. 05-0553, 2007 WL 896889, at *9 (S.D. Ind. Mar. 22, 2007) (noting that although sovereign immunity "might have been raised by the [state defendant] to force the claim back to state court," until that point the court had the option to "ignore sovereign immunity because the state did not raise it").

Plaintiffs argue that LA. REV. STAT. ANN. § 13:5106 conflicts with these rules in that it allows SRA's attorney to circumvent a state law that clearly envisions a waiver of sovereign immunity in state, but not federal courts. However, a plain reading of this statute says nothing about the ability of the State of Louisiana to consent to removal or to remove a suit against it into federal court. Rather, the statute simply states that "[n]o suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court." *Id.* at § 13:5106(A).

In other words, if some person or entity desires to sue the State of Louisiana, it must "institute" that suit in a Louisiana State court. This says nothing about the ability of the State to consent to have a suit initially filed in State court removed to federal court, and says nothing about Eleventh Amendment sovereign immunity. Indeed, subsection (E)(4) of the statute explicitly denies that the statute is asserting Eleventh Amendment sovereign immunity:

> The legislature finds and states: . . . That the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the

[state] constitution.

LA. REV. STAT. ANN. § 13:5106(E).

The Eastern District's ruling in *Shimon*, 2007 WL 4414709, provides an example of these rules in application. *Shimon* involved a drainage project in New Orleans, Louisiana, which was constructed by the Sewage and Water Board of New Orleans ("SWB") and James Construction Group, L.L.C. ("James"). *Id.* at 1. Complaints regarding damages caused by the drainage project led to a lawsuit against SWB, who later joined co-defendant James. *Id.* James then removed the suit pursuant to 28 U.S.C. § 1446, but SWB did not consent. *Id.* In response, plaintiffs filed a motion to remand, arguing that defendant SWB, as an agency or subdivision of the State, must waive Eleventh Amendment sovereign immunity before the court could exercise jurisdiction over the suit. *Id.* The court first found that SWB was an agency or subdivision of the state, and was therefore entitled to Eleventh Amendment immunity. *Id.* at *6. The court then found that because LA. REV. STAT. ANN. § 13:5106's automatic waiver of sovereign immunity "only extend[ed] to state courts," SWB could have have "voluntarily consent[ed] to removal in order to waive its immunity." *Id.* at *7. Because it did not, the court could not retain jurisdiction pursuant to the first exception. However, because "the exercise of jurisdiction over a state court defendant does not defeat Eleventh Amendment Immunity, as the court may ignore immunity until the state defendant asserts it," the court ultimately denied the plaintiffs' motion to remand under the second exception.[17]

Here, SRA has consented to removal, and thereby waived its sovereign immunity. But

---

[17] This motion also included an alternative motion to require that SWB to waive Eleventh Amendment Sovereign Immunity. The *Shimon* court noted that "[w]hile case law would support requiring SWB to explicitly waive its Eleventh Amendment Immunity," the motion was stayed pending resolution of another matter to the Fifth Circuit Court of Appeals. Today, over three years later, the court is still exercising jurisdiction over the suit. *See Meyers ex rel. Benzing v. Texas*, 454 F.3d 503, 504 (5th Cir. 2006) ("In sum, [a state] may assert its state sovereign immunity as defined by its own law as a defense against the plaintiffs' claims in the federal courts, but it may not use it to defeat federal jurisdiction or as a return ticket back to the state court system.").

even if SRA had not consented to removal, we would still have jurisdiction, as SRA has yet to assert its immunity.  We therefore find that an exception to the rule of Eleventh Amendment immunity from suit undoubtedly exists.

### Conclusion

In consideration of the above, this court finds that we have jurisdiction pursuant to 9 U.S.C. § 205.  Accordingly, plaintiffs' motion to remand [doc. 8] is DENIED.

The court also notes that it is within its discretion to stay this action for a brief time to permit the arbitration proceeding to go forward; however, it chooses not to do so and, instead, will allow this matter to proceed before it.  *See Moses H. Cone v. Mercury Const. Corp.,* 460 U.S. 1, 20 n. 23 (1983); *American Home Ins. v. Vecco Concrete Construction,* 629 F.2d 961, 964 (4th Cir. 1980); *Sam Reisfeld & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir. 1976).

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, on October 3, 2011.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE